## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Howard Glaser, individually and on behalf of all others similarly situated, ) ) ) ) | |
| Plaintiff, ) ) | Case No._____ |
| v. ) ) | COMPLAINT  CLASS ACTION JURY TRIAL DEMANDED |
| CertainTeed Corp., USG Corporation, United States Gypsum Company, New NGC, Inc., LaFarge North America Inc., Georgia-Pacific LLC, American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., PABCO Building Products, LLC, ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Howard Glaser, by and through his attorney, on behalf of himself and all others similarly situated, brings this Class Action Complaint ("Complaint") against CertainTeed Corp., USG Corporation, United States Gypsum Company, New NGC, Inc., LaFarge North America Inc., Georgia-Pacific LLC, American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., PABCO Building Products, LLC (collectively "Defendants") and alleges, based upon personal knowledge, information, belief, and the investigation of counsel, as follows:

## JURISDICTION AND VENUE

1.      This action is instituted under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under state antitrust, unfair competition, and consumer protection laws, and to recover

costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of the Defendants' violations of those laws.

2.      The court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims that arise under federal law and under 28 U.S.C. § 1337 for federal antitrust claims in particular.

3.      The Court also has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

4.      This court also has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiffs are citizens of states different from any Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs."

5.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

6.      This Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in the Eastern District of Pennsylvania – transacted business, sold gypsum board, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy. The conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in the Eastern District of Pennsylvania.

2

## PARTIES

7.　　Plaintiff Howard Glaser is a resident of Chestnut Hill, Massachusetts. In the fall of 2012, Mr. Glaser indirectly purchased in Somerville, Massachusetts gypsum board manufactured by Defendant USG Corporation. As a result of the misconduct alleged herein, Mr. Glaser has suffered injury in that he paid more for that product than he would have paid in the absence of the Defendants' misconduct.

8.　　Defendant USG Corporation (referred to collectively with United States Gypsum Company as "USG") is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. USG Corporation, through its wholly-owned subsidiaries United States Gypsum Company and L&W Supply Corporation, is a leading manufacturer and distributor of gypsum board. Defendant United States Gypsum Company is a wholly-owned subsidiary of USG Corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. During the Class Period, USG manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. USG has had the largest market share of any of the manufacturers prior to and during the Class Period. Specifically, in 2011 USG had approximately 25% of sales of gypsum board in the United States.

9.　　Defendant New NGC, Inc. ("National Gypsum"), a wholly-owned subsidiary of Delcor, Inc., commonly known as National Gypsum Company, is a privately-held corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Charlotte, North Carolina. During the Class Period, National Gypsum manufactured and sold gypsum board to purchasers in the United States, including to members

3

of the Class. In 2011, National Gypsum had approximately 23% of sales of gypsum board in the United States.

10.     Defendant LaFarge North America Inc. ("LaFarge"), a wholly-owned subsidiary of LaFarge SA., is a corporation organized, existing, and doing business under the laws of the State of Maryland, with its headquarters in Reston, Virginia. During the Class Period, LaFarge manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, LaFarge had approximately 8% of sales of gypsum board in the United States.

11.     Defendant CertainTeed Corporation ("CertainTeed"), a wholly-owned subsidiary of Saint-Gobain Corp., is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Valley Forge, Pennsylvania. During the Class Period, CertainTeed manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, CertainTeed had approximately 13% of sales of gypsum board in the United States.

12.     Defendant Georgia-Pacific LLC ("Georgia-Pacific"), a wholly-owned subsidiary of Koch Industries, Inc., is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Atlanta, Georgia. During the Class Period, Georgia-Pacific manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, Georgia-Pacific had approximately 10% of the sales of gypsum board in the United States.

13.     Defendant American Gypsum Company LLC ("American Gypsum") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Dallas, Texas. During the Class Period, American Gypsum manufactured and

4

sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, American Gypsum had approximately 10% of sales of gypsum board in the United States.

14.     Defendant TIN Inc. d/b/a Temple-Inland Inc. ("Temple-Inland"), a wholly-owned subsidiary of International Paper Co., is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Memphis, Tennessee. During the Class Period, Temple-Inland manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, Temple-Inland had approximately 7% of sales of gypsum board in the United States.

15.     Defendant PABCO Building Products, LLC referred to collectively with PABCO Gypsum Company as "PABCO"), is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters in Rancho Cordova, California. During the Class Period, PABCO manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, PABCO had approximately 4% of sales of gypsum board in the United States.

16.     The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

17.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiff.

18.     Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## NATURE OF THE ACTION

19.     This lawsuit is a proposed class action to recover damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least September 2011 to the present, to fix, raise, maintain and stabilize the price of gypsum board.  As set forth below, Defendants' conspiracy violates Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and the applicable state law referenced herein.

## INTRODUCTION

20.     Gypsum board – also known as drywall, wallboard, sheetrock or plasterboard – is used in over 90 percent of all new residential and commercial construction projects in the United States.  On average, a new home built in the United States contains more than 6,144 square feet of gypsum.  Because of its sound-dampening, fire-retarding, and moisture-control qualities, gypsum board has no competitively significant substitutes, thus enabling the manufacturer of gypsum board to control the market without fear that purchasers might turn to an alternate product.

21.     From at least September 2011 through the present, the Defendants, manufacturers of gypsum board, combined and conspired to fix and raise the prices at which they sold gypsum board in the United States beginning with large and coordinated price increases that became effective on or about January 1 or 2, 2012. In advance of these coordinated increases, during late September through mid-October 2011, five of the eight defendant manufacturers announced to

their customers that they were raising gypsum board prices in January 2012, each by an

unprecedented 35% and indicated those price increases would remain in place throughout 2012:

- On September 20, 2011, Defendant American Gypsum told customers nationwide that "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products. This increased price (up 35%) will be your price for the entire year 2012. This increase applies to all segments of the business."

- On September 30, 2011, Defendant National Gypsum told customers nationwide that "National Gypsum Company will implement a price increase of 35% on all wallboard products, to be effective on January 1, 2012. It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2011, Defendant CertainTeed wrote to inform its customers that they would receive a new price schedule on November 15 for "all wallboard products." CertainTeed subsequently told customers that "our price increase, intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products."

- On October 4, 2011, Defendant LaFarge North America informed its customers nationwide that "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products."

- On October 12, 2011, Defendant PABCO told customers nationwide that "Effective January 1, 2012, PABCO will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

22.     Defendants USG, Temple-Inland and Georgia-Pacific also communicated to

customers that they would be imposing substantial price increases effective on the same date and

for the same duration.

23.     The 2011 price increase announcements were led by Defendant American

Gypsum, which had a small market share relative to industry leaders like Defendants USG and

New NGC. Absent assurances and agreement that its "competitors" would follow, such

"leadership" by a small player would have been contrary to American Gypsum's self-interest,

given the market conditions described below. Because gypsum board is a commodity product, in

the absence of collusion, Defendants' price increases would have contravened each Defendant's

independent self-interest, as anyone could have profited and gained market share by undercutting the others during a period where the Defendants had substantial unused capacity.

24.     Moreover, contrary to prior history in the industry, Defendants not only announced these coordinated price increases, they also successfully maintained much higher prices throughout 2012.  These increases were imposed despite a soft construction market, as discussed *infra*.  Defendants also maintained substantially higher prices in the face of significant industry overcapacity that would have made it virtually impossible for any Defendant independently to impose and maintain a substantial price increase on its customers in the absence of collusion.

25.     At virtually the same time, each of the Defendants also abruptly abolished its use of a decades-old competitive pricing practice known as "job quotes."  This practice was used throughout the gypsum board industry and was a central component of each Defendant's business model.  Job quotes permitted customers to lock in the price of gypsum board for the entire course of a construction project.  Notwithstanding the pivotal role this pricing model had played in the industry for more than four decades, each Defendant abruptly eliminated the practice in late 2011, at the same time that they put in place the industry-wide price increases described above.

26.     This dramatic change in longstanding competitive pricing practices used by each of the Defendants was implemented, for example, in the following communications:

- On September 30, 2011, Defendant American Gypsum told its customers that "***Effective immediately, we will no longer be providing job quotes.***"[1]

- On September 28, 2011, Defendant USG told its customers that "***USG will no longer offer job quotes and/or price protection on wallboard, effective immediately.***"  USG told customers that it would only adhere to job quotes "that have been committed to USG with a purchase order by October 15, 2011."

---

[1] Emphasis is supplied throughout unless otherwise noted.

- On September 30, 2011, Defendant New NGC told its customers that *"effective immediately, we will discontinue for all product lines the policy of providing job quotes."* National Gypsum stated that "[w]e will strictly enforce this policy and have set a date of October 14, 2011" by which customers had to verify any earlier job quotes.

- On October 3, 2011, Defendant CertainTeed told its customers that it was going to *"cease all job quotes immediately."* Like its co-conspirators, CertainTeed told customers that with respect to outstanding job quotes, "we will require all <u>existing</u> projects to be confirmed with a firm purchase order or written notice of intent by October 14, 2011. This policy will be strictly enforced."

- On October 4, 2011, Defendant LaFarge North America told its customers that *"effective immediately, we will cease all job quotations."* Like other co-conspirators, LaFarge told customers that "[a]s for outstanding job quotes, we will require all existing projects to be validated with a Letter of Intent signed by the dealer and successful contractor by not later than October 14, 2011. This policy will be strictly enforced."

- On October 12, 2011, Defendant PABCO told its customers nationwide that *"Effective immediately, PABCO will discontinue the policy of providing job quotes.* All previously committed quotes [*i.e.*, all quotes prior to October 12, 2011] will be honored and must be validated in writing[.]"

27.     Each of the remaining Defendants communicated to its customers at or near this time that it was abolishing job quotes effective immediately.

28.     Prior to this abrupt change in the longstanding industry practice, the "job quote" policy protected the Defendants' customers from price increases occurring during their respective construction projects (*i.e.* "jobs") by allowing the customers to lock in prices for gypsum board (sometimes with limited, pre-defined price increases allowed) at the beginning of the project. In addition, job quotes were an avenue for price competition between manufacturers, as customers could get bids from a variety of manufacturers and play one off of the other. But the collusive change in the industry pricing model limited such competition and shifted the risk of future price increases squarely to customers and was expressly designed to allow Defendants to profit from both this and any future price increases. As one industry research group described

9

it: "The elimination of job quotes paves the way for a meaningful price increase. . . . That, in a nutshell is the story."[2]

29.     Moreover, the elimination of competitive job quotes facilitated collusion because it made pricing more transparent and consistent throughout the industry and thus allowed Defendants to more easily monitor and detect cheating from the conspiracy.    Prior to the elimination of job quotes, as much as 70 percent of all gypsum board was sold pursuant to a job quote.  If job quotes had remained in place, a Defendant's failure to implement a collusive price increase would not necessarily mean defection from a conspiracy, but could simply be pricing consistent with the Defendant's pre-existing job quote.  With the job quote practice eliminated, however, any failure to impose price increases on customers would be more readily recognized by co-conspirators as cheating on the cartel.  Thus, by collusively eliminating the job quote policy, Defendants not only ensured more immediate and consistent implementation of their conspiratorial 2012 price increase, but facilitated the monitoring of the conspiracy.

30.     The job quote pricing model had been an ingrained industry practice for over four decades and provided price protection for a substantial portion of all gypsum board purchases. Accordingly, any one Defendant seeking to eliminate this practice by itself would have been met with opposition and likely defections from customers.  Only through coordination, therefore, was the reversal and elimination of this long-standing practice possible.    Without all of the Defendants eliminating job quote pricing, a Defendant would have lost significant market share to competitors who continued to provide job quotes.  The Defendants' conspiracy, however, allowed them to effectuate this historically unprecedented change in price structure without fear of customer reprisal.

---

[2] Brian Johnson, *Not Good Timing: Drywall Prices Rising*, FINANCE & COMMERCE, Feb. 16, 2012 (quoting Kathryn Thompson, Senior Research Analyst for the Thompson Research Group). *See http://finance-commerce.com/2012/02/%e2%80%98not-good-timing%e2%80%99-drywall-prices-rising/*

31.     The Defendants also implemented supply restrictions to facilitate the conspiracy's ability to impose and maintain industry-wide price increases.  These supply restrictions were put in place even though there was substantial unused capacity in the industry.  (In fact, the industry was barely operating at fifty percent of its actual capacity.)  It would have been contrary to the unilateral interests of any Defendant to restrict its supply of gypsum board to customers absent the conspiracy because customers would have simply turned to competing suppliers to meet their needs.  Similarly, because of limited demand for gypsum board and substantial overcapacity, no manufacturer could have imposed and maintained large price increases or eliminated longstanding competitive pricing practices such as job quotes in the absence of a conspiracy.  Had they tried to do so, customers would have shifted their business to other suppliers.

32.     The Defendants' conspiracy was facilitated by the numerous meetings in the gypsum board and building supply industries which provided ample opportunity to collude.  For example, Defendants participate in multiple trade association meetings, including meetings of the Gypsum Association and the AWCI Industry Executives' Conference.  Most notably, the Defendants attended industry meetings held by these trade groups in mid-September and mid-October 2011 – at or around the time that they announced their initial price increases in furtherance of their conspiracy.

33.     Defendants implemented their non-competitive pricing practices on January 1, 2012.  Since then none of the Defendants has defected from the cartel and eliminated the price increase or reinstituted a job quote policy to gain market share.  Not only have Defendants maintained their earlier price increases, they have recently announced substantial additional price increases effective January 1, 2013, with the intention of maintaining increased prices throughout 2013.  For example:

- On August 22, 2012, Defendant American Gypsum told its customers that it would impose a 25% price increase on all gypsum board products on January 1, 2013 and that price increase would apply to all work performed in 2013.

- On September 6, 2012, Defendant National Gypsum told its customers that it "will increase prices on its entire Gypsum Wallboard product line...by **30%** across the board. It is once again, our intention that this increase will be good for the entire calendar year of 2013. In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced." (Emphasis in original).

- On September 13, 2012, Defendant CertainTeed told customers that it "will increase price effective with shipments on January 2, 2013 by 30%. This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." CertainTeed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant LaFarge told its customers that effective January 1, 2013, it would increase the price of all wallboard products by 30% and "[t]his price increase applies to all our gypsum board products and is intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO told its customers that "[e]ffective January 1, 2013, PABCO will implement a 30% price increase across all product lines. This increase will establish pricing for the calendar year 2013."

34. Defendants USG, Georgia-Pacific and Temple-Inland also have informed customers that substantial price increases will be imposed on the same effective date and for the same duration and that their policy of eliminating job quotes remains in place.

35. As a result of Defendants' collusion, Plaintiff and all other indirect purchasers of gypsum board have paid artificially inflated prices. This action is brought by Plaintiff and the proposed class to secure the relief afforded by the Sherman Act and applicable state laws against Defendants' unlawful conspiracy.

## CLASS ALLEGATIONS

36. Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Nationwide Class" or "Class") consisting of:

All person or entities currently residing in the United States who indirectly purchased gypsum board in the United States from January 1, 2012 through the present (the "Class Period") for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.   Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

37.     Plaintiff also brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes (collectively, the "Indirect Purchaser State Subclasses" or "State Subclasses"):

(a) **Arizona:**  All persons and entities who, from January 1, 2012 through present, as residents of Arizona, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Arizona Indirect Purchaser Subclass").

(b) **Arkansas:**  All persons and entities who, from January 1, 2012 through present, as residents of Arkansas, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Arkansas Indirect Purchaser Subclass").

(c) **California:**  All persons and entities who, from January 1, 2012 through present, as residents of California, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "California Indirect Purchaser Subclass").

(d) **District of Columbia:**  All persons and entities who, from January 1, 2012 through present, as residents of the District of Columbia, indirectly purchased gypsum board for end use and not for resale.  Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "District of Columbia Indirect Purchaser Subclass").

(e) **Florida:**  All persons and entities who, from January 1, 2012 through present, as residents of Florida, indirectly purchased gypsum board for end use and not for resale.  Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Florida Indirect Purchaser Subclass").

(f) **Illinois:**  All persons and entities who, from January 1, 2012 through present, as residents of Illinois, indirectly purchased gypsum board for end use and not for resale.  Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators.  Also

14

excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Illinois Indirect Purchaser Subclass").

(g) **Iowa:** All persons and entities who, from January 1, 2012 through present, as residents of Iowa, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Iowa Indirect Purchaser Subclass").

(h) **Kansas:** All persons and entities who, from January 1, 2012 through present, as residents of Kansas, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Kansas Indirect Purchaser Subclass").

(i) **Maine:** All persons and entities who, from January 1, 2012 through present, as residents of Maine, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Maine Indirect Purchaser Subclass").

(j) **Massachusetts:** All persons and entities who, from January 1, 2012 through present, as residents of Massachusetts, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Massachusetts Indirect Purchaser Subclass").

(k) **Michigan:** All persons and entities who, from January 1, 2012 through present, as residents of Michigan, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Michigan Indirect Purchaser Subclass").

(l) **Minnesota:** All persons and entities who, from January 1, 2012 through present, as residents of Minnesota, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Minnesota Indirect Purchaser Subclass").

(m) **Mississippi:** All persons and entities who, from January 1, 2012 through present, as residents of Mississippi, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any

co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Mississippi Indirect Purchaser Subclass").

(n) **Missouri:**  All persons and entities who, from January 1, 2012 through present, as residents of Missouri, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Missouri Indirect Purchaser Subclass").

(o) **Nebraska:**  All persons and entities who, from January 1, 2012 through present, as residents of Nebraska, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nebraska Indirect Purchaser Subclass").

(p) **Nevada:**  All persons and entities who, from January 1, 2012 through present, as residents of Nevada, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Nevada Indirect Purchaser Subclass").

(q) **New Hampshire:**  All persons and entities who, from January 1, 2012 through present, as residents of New Hampshire, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Hampshire Indirect Purchaser Subclass").

(r) **New Mexico:**  All persons and entities who, from January 1, 2012 through present, as residents of New Mexico, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New Mexico Indirect Purchaser Subclass").

(s) **New York:**  All persons and entities who, from January 1, 2012 through present, as residents of New York, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "New York Indirect Purchaser Subclass").

(t) **North Carolina:**  All persons and entities who, from January 1, 2012 through present, as residents of North Carolina, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants;

and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "North Carolina Indirect Purchaser Subclass").

(u) **North Dakota:** All persons and entities who, from January 1, 2012 through present, as residents of North Dakota, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "North Dakota Indirect Purchaser Subclass").

(v) **Puerto Rico:** All persons and entities who, from January 1, 2012 through present, as residents of Puerto Rico, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Puerto Rico Indirect Purchaser Subclass").

(w) **Rhode Island:** All persons and entities who, from January 1, 2012 through present, as residents of Rhode Island, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Rhode Island Indirect Purchaser Subclass").

(x) **South Dakota:** All persons and entities who, from January 1, 2012 through present, as residents of South Dakota, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "South Dakota Indirect Purchaser Subclass").

(y) **Tennessee:** All persons and entities who, from January 1, 2012 through present, as residents of Tennessee, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Tennessee Indirect Purchaser Subclass").

(z) **Utah:** All persons and entities who, from January 1, 2012 through present, as residents of Utah, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Utah Indirect Purchaser Subclass").

(aa) **Vermont:** All persons and entities who, from January 1, 2012 through present, as residents of Vermont, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any

co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Vermont Indirect Purchaser Subclass").

(bb)   **West Virginia:**   All persons and entities who, from January 1, 2012 through present, as residents of West Virginia, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "West Virginia Indirect Purchaser Subclass").

(cc)   **Wisconsin:** All persons and entities who, from January 1, 2012 through present, as residents of Wisconsin, indirectly purchased gypsum board for end use and not for resale. Excluded from the Class are: Defendants; the officers, directors or employees of any Defendant; the parent companies, subsidiaries and affiliates of any Defendant; the legal representatives and heirs or assigns of any Defendants; and any co-conspirators. Also excludes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action (the "Wisconsin Indirect Purchaser Subclass").

38.     The Class is so numerous that joinder of all members is impracticable.   On information and belief, thousands of individuals and entities purchased gypsum board from the Defendants during the Class Period.

39.     Plaintiff's claim is typical of the claims of the members of the Class and State Subclasses because Plaintiff and all Class and State Subclass members share the same injury, as they were all damaged by the actions of Defendants which caused them to pay artificially inflated prices for gypsum board.

40.     Plaintiff will fairly and adequately represent and protect the interests of the Class and State Subclass members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class and State Subclass members.

41.     Plaintiff is represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

42.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class and the State Subclasses, such as:

- Whether the Defendants engaged in a conspiracy to raise, fix, and maintain prices of gypsum board sold in the United States;
- Whether the Defendants conspired to eliminate the practice of providing job quotes;
- The duration and extent of the conspiracy;
- Whether each Defendant was a participant in any such conspiracy;
- Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act and the applicable state laws, discussed below;
- Whether the conspiracy had the effect of artificially stabilizing, maintaining, and/or inflating the price of gypsum board sold in the United States during the Class Period;
- Whether the conduct of the Defendants caused injury to Class and State Subclass members; and
- The measure and amount of damages incurred by the State Subclasses.

43.     Adjudicating the claims of the Class and State Subclass members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class and State Subclasses would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.   This

action presents no difficulties in management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

44.     Defendants' conduct, as described in this Complaint, were within the flow of, were intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

45.     During the Class Period, Defendants manufactured, sold and shipped gypsum board in a continuous and uninterrupted flow of interstate commerce throughout the United States and its territories. The price-fixing conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### A.     Gypsum Board

46.     Gypsum board consists primarily of a solid, flat core of gypsum rock sandwiched in between two sheets of linerboard paper. It is commonly called drywall, sheetrock, wallboard or plasterboard. To be considered gypsum board, the core must be predominately gypsum.

47.     Gypsum (chemical name: hydrated calcium sulfate) is one of the more common minerals in sedimentary environments and is formed by the evaporation of extremely saline waters. Although there are two types of gypsum – natural and synthetic – they are chemically identical ($CaSO_4 \cdot 2H_2O$).

48.     Natural gypsum is a mineral mined in seventeen states and many parts of the world. In 2010, the leading crude gypsum-producing states were Nevada, Iowa and California. Gypsum is extracted through mining or quarrying veins of ore that occur close to the surface of

the earth. Gypsum deposits lie in flat beds of about six to eight feet in thickness, and are often inter-layered with limestone or shale.

49.     One hundred pounds of gypsum contains approximately 21 pounds of chemically combined water. To remove the majority of this water and turn the raw product into usable gypsum, it is first crushed into a powder and heated to 350 degrees Fahrenheit. This process is classed "calcining." The powder is then made into gypsum board by mixing it with water and other additives and feeding the slurry between layers of paper on a board machine. The paper edges of the board are machine-wrapped as the face and back paper become chemically and mechanically bonded to the gypsum core. The board is cut to length and conveyed through dryers to remove any of the remaining moisture. After the board is dried, it is inspected and trimmed again. Individual boards are bound together in pairs in a two-sheet stack called a "book."

50.     Approximately 90% of gypsum mined in the United States is used to produce gypsum board. Of the gypsum board used in construction, half is used in new residential construction. Gypsum board is used in more than 97% of the new homes constructed in the United States and Canada, and an average new American home contains more than 7.31 metric tons of gypsum wallboard.

51.     Gypsum board is sold in standardized widths, lengths and thicknesses. One-half inch, 5/8 inch and 5/16 inch are the most common thicknesses, and 12 feet by 4 feet is the most commonly produced size.

52.     Gypsum board differs from products like plywood, hardboard and fiberboard because of the non-combustible core, primarily comprised of fire-resistant gypsum.

24

**B.**     **The Gypsum Industry**

53.     The major manufacturers of gypsum board have annual sales of more than $5 billion dollars.

54.     Most manufacturers of gypsum are vertically integrated, meaning that they participate in each successive step of production, including producing the primary inputs into gypsum board – such as gypsum and paper – and turning these inputs into the finished product.

55.     The products of the Defendants are functionally interchangeable, and the gypsum board produced by one Defendant does not differ significantly in quality, appearance or use from that produced by another Defendant.   Gypsum board is produced and sold in standard dimensions.

56.     The Gypsum Association itself describes gypsum board as "a *family* of sheet products consisting of a noncombustible core primarily of gypsum with a paper surfacing or facing."  Defendants admit in public filings that gypsum board is more like a "commodity" in that competition is largely based on price, which Defendants recognize is the principal driver of competition.

**C.**     **Market Characteristics Conducive to Collusion**

> **1.**     **The Gypsum Board Market in the United States is Conducive to Collusion Because It Is Controlled By Only A Limited Number Of Producers.**

57.     The gypsum board market in North America is highly concentrated among a few producers.  Defendants collectively account for over 99% of the gypsum board sold in the United States and Canada.  The three largest Defendants account for more than 60% of the U.S. sales of gypsum board.

| *Manufacturer* | *Market Share 2011* |
|---|---|
| USG | 25% |
| National Gypsum | 23% |
| Saint Gobain/BPB/CertainTeed | 13% |
| Georgia-Pacific | 10% |
| American Gypsum | 10% |
| LaFarge | 8% |
| Temple-Inland | 7% |
| PABCO | 4% |

58.    The level of concentration set forth above is relatively recent.  In the early 1990's there were several smaller manufacturers with only one or two plants and a regional focus.  This is evidenced by the Defendants' public documents.  For example, prior to 2002, the Defendants' investor filings discussed competition from "smaller, regional competitors" in the United States. These references ceased, however, after 2002 as the industry became increasingly consolidated. In fact, in the last fifteen years, the number of gypsum board manufacturers has dropped from sixteen to only eight.  Today, sales of gypsum board in the United States are almost entirely dominated by the Defendants and their affiliates.

59.    This increased concentration of gypsum board sales facilitated the conspiracy because a potential cartel would need only to conspire with and police a limited number of companies to be successful.  This concentration facilitated not only the fixing of prices but also the coordination of pricing terms (including the elimination of job quote pricing).

60.     Empirical scholarship on cartels has primarily focused on the concentration measure called the $CR_4$ -- the four firm concentration ratio based upon the share of product sales accounted for by the four largest firms in the industry – as a diagnostic in analyzing what levels of concentration facilitates multi-firm collusion.

61.     A seminal study of Department of Justice price-fixing investigations found that 76 percent of the cartels occurred in sectors with a $CR_4$ score of 50% or higher, which was about double the average $CR_4$ for manufacturing as a whole.  As demonstrated by the chart above, the $CR_4$ for the gypsum board market is **71%**, a level of market concentration conducive to cartelization.

### 2.     High Barriers To Entry In The Gypsum Board Market Make The Industry Susceptible To Collusion

62.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants to the market.  Where there are significant barriers to entry, however, new entrants are less likely to emerge.  Thus, barriers to entry facilitate the formation of cartels.

63.     With regard to gypsum board sales in the United States, there are substantial barriers that preclude, reduce or make difficult entry into the gypsum board market.  For example, entry into the gypsum board market involves significant start-up capital expenditures. A new entrant into the business would have to incur tens, if not hundreds, of millions of dollars in costs, including capital expenditures on plants and equipment, regulatory approvals, as well as transportation, electricity, infrastructure for distribution, and labor.  The equipment needed to manufacture gypsum board is custom-built and would take several years before it could become operational.

64.     Moreover, gypsum board manufacturers are vertically integrated. Thus, to compete effectively in the gypsum board market a new entrant would not only have to acquire the means to produce the major inputs into gypsum board, such as access to a limited number of gypsum mines, but also would need to acquire the means to refine these inputs into finished gypsum board, and to place the product into the marketplace. Further, the major manufacturers already maintain networks of distribution centers which not only make products available, but provide advice about the products as well as information about new product developments to customers. This downstream capability is imperative to competing successfully in this industry and would take time as well as capital in order to replicate. As examples of the cost of entering into the market, the purchase of one gypsum line and wallboard plant in Nashville, Arkansas cost $97 million in 1997, and the purchase of Celotex Corporation's gypsum wallboard business cost $345 million dollars in 2000.

65.     These high barriers to entry helped facilitate Defendants' conspiracy, as they ensured that no new competitors would be able to enter the market to undermine the collusive prices and pricing terms.

    **3.     Price Inelasticity For Gypsum Board Makes The Industry Susceptible To Collusion**

66.     When a seller of goods or services can increase prices without suffering substantial reduction in demand, pricing is considered inelastic. Price inelasticity facilitates collusion, allowing producers to raise their prices collectively without triggering customer substitution and lost sales revenue.

67.     Pricing for gypsum board is highly inelastic, in large part because there are no adequate substitutes. Gypsum board is used in virtually all new construction and renovation projects for commercial or residential structures throughout the United States, and because there

is no functionally equivalent product, gypsum board must be purchased for these projects. This is because gypsum board differs from other construction materials in its composition, function characteristics, customary uses, and low cost. It is also different from other construction materials such as plaster or lumber because of its ease of application, smooth finish and fire-resistant and moisture-controlling qualities.

68.     A hypothetical small but significant increase in the price of gypsum board by a cartel would not cause a significant number of purchasers to utilize other materials in lieu of gypsum board, nor would such a hypothetical price increase cause so much switching to other products that the increase would be unprofitable.

69.     Because the price for gypsum board is highly inelastic, Defendants were able to collectively raise prices to supra-competitive levels without losing revenues.

### 4.     The Defendants Had Many Opportunities To Collude

70.     The gypsum board industry provides ample opportunities for Defendants to collude and fix the price of gypsum board through, among other things, trade associate meetings and analyst phone calls.

71.     For example, every Defendant is a member of the Gypsum Association (the "Association"), and most sit on its Board. The Gypsum Association board of directors for the 2011-2012 term included: Chairman Leo J. Bissonnette (Georgia-Pacific), Past Chairman Stephen Raley (Temple-Inland), First Vice President John K. Donaldson (CertainTeed), Second Vice President Joseph Holmes (USG) and Treasurer Craig Robertson (National Gypsum). The board of directors for the current 2012-2013 term include: Chairman Joseph Holmes (USG), Past Chairman Leo J. Bissionnette (Georgia-Pacific), First/ Second Vice Chairman Craig Roberson (National Gypsum), and Treasurer Ryan Lucchetti (PABCO).

29

72.     The Association was founded in 1930 and, in addition to publishing a number of promotional, educational, and technical materials concerning the gypsum board industry, it hosts quarterly meetings and a yearly conference, at which the Defendants are regular attendees. Numerous employees of the Defendants, including their CEOs and high ranking executive, attended these meetings, which sometimes feature informal dinners for the attendees/competitors at the hotels where they are held.

73.     In addition, Each Defendant is also a member of the Association of the Wall and Ceiling Industry ("AWCI"). Defendants attended the annual AWCI Industry Executives' Conference & Committee Meeting over a four-day period in mid-September 2011 in Coeur d'Alene, Idaho.     Shortly thereafter, the Defendants met in mid-October at the Gypsum Association trade meeting in Las Vegas, Nevada. Notably, these AWCI and Association events were contemporaneous with the announcement of the Defendants' price increases for 2012.

74.     In sum, these industry meetings, among others, provided opportunities to meet and confer regarding the price of gypsum board, elimination of competitive job quotes, and implementation of the conspiracy described herein.

## 5.     The Gypsum Board Industry's History Of Collusive Behavior

75.     The Defendants have engaged in similar anticompetitive behavior in the past. In 2002, the European Union fined four gypsum companies $455 million dollars for engaging in a price- fixing scheme for gypsum board and other products between 1992 and 1998. Two of these companies – LaFarge and BPB P.L.C. (which merged with CertainTeed in the United States) – sell in the United States and are Defendants in this action.

76.     The gypsum board industry has run afoul of U.S. antitrust laws many times in the past. In *U.S. Gypsum Co. v. National Gypsum Co.*, 333 U.S. 364 (1948), the Supreme Court

reversed the dismissal of a Sherman Act complaint against manufacturers of gypsum wallboard, including Defendant US Gypsum, finding that there was sufficient evidence to support a finding that the defendants had violated Sections 1 and 2 of the Sherman Act by engaging in a conspiracy to restrain and monopolize interstate trade in gypsum products. Likewise, in *Wall Products Co. v. National Gypsum Co.*, 326 F. Supp. 295 (N.D. Cal. 1971), US Gypsum and National Gypsum, among others, were found to have violated the Sherman Act by combining and conspiring among themselves to stabilize and maintain the price of gypsum wallboard.

77.     Similarly, after a nineteen week trial in the 1970's, six gypsum manufacturers, including defendants US Gypsum, National Gypsum, and Georgia-Pacific, were convicted of criminal antitrust violations in a nationwide conspiracy to fix the price of gypsum board. While their convictions were overturned due to faulty jury instructions, the Third Circuit (on remand from the Supreme Court) denied the manufacturers' motion for a judgment of acquittal, finding there was sufficient evidence from which a jury could have concluded the conspiracy violated the Sherman Act. *See United States v. United States Gypsum Co.*, 600 F.2d 414, 419-20 (3d Cir. 1979).

### D.     The Conspiracy

78.     Starting in or before September 2011, Defendants engaged in a conspiracy to raise, fix, maintain and or stabilize the price of gypsum board and eliminate a long-standing "job quotes" pricing practice.

### 1.     Defendants' Price Increases Effective January 1, 2012

79.     The price increase in gypsum board announced in the fall of 2011 was the largest in more than a decade. All of the Defendants indicated that this price increase would be implemented on virtually the same date, either January 1 or January 2, 2012. Contrary to

prior industry practice, all of the Defendants told customers that the price increase would remain in effect throughout 2012. At the same time, each of the Defendants announced that it was abolishing competitive job quotes.

80.    To announce these drastic changes, Defendants issued price increase letters or otherwise communicated with their customers in late 2011 setting out these plans. These 2011 price increase letters included key language describing the Defendants' actions that was remarkably similar. In addition, the effective date for imposition of the price increases was virtually identical and the duration of the price increases was the same for all letters.

81.    These actions were described by one distributor to its customers in December 2011 as follows: "As you are probably now aware, all the drywall manufacturers have revised their pricing strategies beginning in 2012. ... The manufacturer letters that have been published vary slightly from manufacturer to manufacturer but it amounts to approximately 35% across the gypsum wallboard category."[3]

82.    The Defendants' large spike in gypsum board prices was not in response to – or in expectation of – an increase in demand for gypsum board. To the contrary, Defendants anticipated flat demand, warning investors in 2012 that "demand for drywall would be no better this year than last." National Gypsum stated that wallboard demand "has essentially been flat and at historically low levels" and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'" CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year." Similarly, in October 2011, USG stated that it believed that the market is "going to be flat next year."

---

[3] National Lumber Online Networking Forum. *See* http://nationallumber.wordpress.com/2011/12/20/2012-drywall-price-increase-explanation/

83. Moreover, prior to the Defendants' collusive 2011 price increase announcements, gypsum board prices had been in a three-month period of decline, falling 0.6% in July 2011, 1.7% in August 2011 and 1.7% in September 2011.

84. Faced with a weak market with no immediate prospect of rebound, the Defendants nevertheless simultaneously announced a large spike in the price of gypsum board. This increase was not supported by competitive conditions and thus could not have been sustained absent the Defendants' illegal agreement to raise prices.

85. The large 2012 price increase also was not reflective of increased costs of producing and selling gypsum board. The costs of the major inputs into gypsum board were stable or even falling in the 2011-2012 period. Moreover, most of the Defendants are vertically integrated companies, and thus have the ability to control to a certain extent the biggest cost inputs of gypsum board – gypsum and paper – because they mine or produce these materials themselves.

86. Absent collusion, if input costs remain stable or fall and demand is flat, prices would be expected to remain flat or fall as well. The fact that prices rose substantially and for all Defendants in 2012, despite competitive conditions dictating stable or falling prices, is indicative of collusive behavior. Here, Defendants were able to increase prices for gypsum board even in the face of stable input costs and flat demand without fear that their customers could turn to competitors who were selling at a lower price because of their conspiracy as alleged herein.

87. Moreover, these price increases were imposed at a time when there was substantial overcapacity in the industry. In October 2011, US Gypsum reported that "[c]urrently, there is significant excess wallboard production capacity industry wide in the

33

United States. Industry capacity in the United States was approximately 32.9 billion square feet. We estimate that the industry capacity utilization rate was approximately 52% during the first nine months of 2010. We project that the industry capacity utilization will remain at approximately that level for the balance of 2011." Industry analysts have recognized the downward pressure this creates on pricing noting, for example, that wallboard prices have tended to weaken historically when the industry's rate of capacity utilization has declined below 90%.

88.     In the absence of collusion, each of the Defendant's respective self-interest would have dictated price cutting, or at least price moderation, to undercut their rivals' price increases. If only one or a few of the Defendants had increased their prices in the existing soft market, they would have lost sales, customers and market share to the Defendants who did not raise prices. No one Defendant would have had the leverage to increase prices profitably for gypsum board to this degree absent collusion.

### 2.     Defendants' Elimination of Job Quotes

89.     Concurrent with the fall 2011 price increase announcements, the Defendants also announced the elimination of the industry's longstanding practice of providing job quotes. Job quotes – also called price protection – had been a competitive pricing practice in the gypsum board industry for more than four decades. Job quotes allowed customers to lock in a price for gypsum board (sometimes with specified pre-determined price increases) supplied throughout the entire course of a construction project. The abrupt elimination of job quotes by the Defendants represented a fundamental change in this longstanding competitive price practice for the gypsum board industry.

34

90.     Job quotes are a specific method of quoting prices and have a direct effect on the price of wallboard paid by a customer. Job quotes are a form of discount that provide direct economic benefits to gypsum board customers for the duration of a construction project.

91.     Until 2011, it was a standard competitive practice in the industry to allow purchasers of gypsum board to negotiate job quotes with the Defendants. Prior to implementation of Defendants' conspiracy, as much as 70 percent of all gypsum board was sold pursuant to a job quote. One distributor described this price protection practice as "ingrained" in the industry.

92.     The agreement to eliminate this form of price competition facilitated Defendants' tracking and monitoring of cartel members' prices, and thus the enforcement of the conspiracy. The use of job quotes made competitor pricing in the industry relatively opaque. With job quote pricing in place, it thus would be harder for one cartel member to determine whether a low price given to a particular customer by another cartel member was pursuant to a job quote or was instead a defection from the cartel price. Without job quotes, Defendants would be better able to monitor and discipline other cartel members in furtherance of their overall price-fixing conspiracy. By collectively eliminating this form of price competition, the Defendants ensured that each of them could more easily, accurately and comprehensively learn each other's prices. Thus, the elimination of job quotes both facilitated the coordinated price hikes and the policing of the conspiracy.

93.     The primary effect of Defendants' agreement to eliminate job quotes was to increase the price of gypsum board. Recent reports have confirmed that the elimination of job quotes coupled with the announcement of a single higher price that will remain in place for the entire year has resulted in a sharp rise in wallboard prices in 2012.

94.     The letters alerting purchasers about the discontinuation of job quotes closely mirrored one another:

- "Our past job quote policy is no longer appropriate as we seek to improve the consistency and administrative efficiency of our pricing policies.  In light of the changing market, *USG will no longer offer job quotes and/or price protection on wallboard, effective immediately*." (USG letter, September 28, 2011)

- "The practice of providing job quotes is broken and counterproductive to meaningful and consistent price management needed to support profitability.  Therefore*, effective immediately, we will discontinue for all product lines the policy of providing job quotes*." (National Gypsum letter, September 30, 2011).

- "In review of our business practices and policies for bringing products to market, we have noted a significant increase in the amount of job quote requests and find the process to be inefficient and administratively burdensome.  Accordingly *we find it necessary to cease all job quotes immediately*." (CertainTeed letter, October 3, 2011).

- "*Effective immediately, we will no longer be providing job quotes*."  (American Gypsum Letter, September 20, 2011).

- "... *[E]ffective immediately, we will cease all job quotations*." (LaFarge Letter, October 4, 2011).

- "*Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes*." (PABCO Letter, October 12, 2011).

95.     It would have been against the self-interest of any one Defendant to eliminate the job quote pricing practice unilaterally.   Absent collusion, any Defendant who was unwilling to offer this competitive pricing term would have lost sales and market share to competitors who continued to offer this price protection to customers.  No one Defendant would have had the leverage to eliminate this form of competition by itself; only by conspiring could Defendants have effectively eliminated this practice.  Thus, the agreement to eliminate job quotes reduces competition between the Defendants.

96.     Since the Defendants announced the discontinuation of job quotes in the fall of 2011, each of the Defendants has continued to make this price protection unavailable to

customers. For example, on September 6, 2012, National Gypsum told customers that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced." On September 13, 2012, CertainTeed told customers that it "continues our policy of not providing price quotes to customers for specific projects." The other Defendants have, in like manner, adhered to the elimination of job quotes imposed by all of the conspirators in late 2011.

### 3. Defendants' Supply Restrictions

97. In conjunction with the price increases described herein, Defendants also have imposed restrictions on the supply of gypsum board that will be made available to distributors. For example, distributors and/or customers were informed by USG, National Gypsum, American Gypsum, PABCO, CertainTeed and Georgia-Pacific in or about September 2011, that they were not permitted to purchase supplies of gypsum board that exceeded earlier purchases during the year. These supply restrictions facilitated the Defendants' ability to impose and maintain the price increases described herein.

98. To help enforce supply restrictions, Defendants have notified and/or monitored distributors to ensure that they did not build up surplus inventory to circumvent price increases. Pursuant to the conspiracy, Defendants have alerted co-conspirators when a particular distributor appears to be accumulating excess supply and have notified the distributor that its purchases are being monitored.

99. These supply restrictions have been imposed despite the substantial unused capacity in the gypsum board industry. As set forth above, and as acknowledged by USG in 2012, the industry's capacity utilization is still at "historically low" levels.

100. Because of this underutilized capacity, it would have been contrary to the independent interests of any individual Defendant to restrict the supply of gypsum board made

available to its purchasers. If an individual manufacturer withheld supply from a purchaser, the purchaser could – in an unrestrained marketplace – approach competing manufacturers with unused capacity. Thus, a manufacturer restricting supply to a customer unilaterally would risk not only loss of that specific business, but could also jeopardize the customer relationship by encouraging the customer to do business with a competitor. The conspiracy, however, has allowed each Defendant to impose large price increases and supply restraints without fear of losing business to its co-conspirators.

### 4.    Defendants' January 1, 2013 Price Increases

101.    Although demand has recently shown modest improvement, Defendants continue to impose price increases that are significantly out of proportion to changes in demand. The Defendants have recently informed customers that they will impose another round of large, *identical* price increases. These increases will again be implemented on the same date (January 1, 2013), and will again remain in place for the same duration (throughout 2013). For example:

- On August 22, 2012, Defendant American Gypsum told its customers that it would impose a 25% price increase on all gypsum board products on January 1, 2013 and that price increase would apply to all work performed in 2013.

- On September 6, 2012, Defendant National Gypsum told its customers that it "will increase prices on its entire Gypsum Wallboard product line... by **30%** across the board. It is once again, our intention that this increase will be good for the entire calendar year of 2013. In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced." (Emphasis in original).

- On September 13, 2012, Defendant CertainTeed told customers that it "will increase price effective with shipments on January 2, 2013 by 30%. This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." CertainTeed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant LaFarge told its customers that effective January 1, 2013, it would increase the price of all wallboard products by 30%

38

and "[t]his price increase applies to all our gypsum board products and it
intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO told its customers that "[e]ffective
January 1, 2013, PABCO Gypsum will implement at 30% price increase across
all product lines. This increase will establish pricing for the Calendar Year
2013."

102.  At or about the same time, USG, Temple-Inland and Georgia-Pacific also
informed customers that substantial price increases will be imposed effective January 1, 2013,
that those price increases will remain in effect throughout the year, and that their policy of
eliminating job quotes remains in place.

103.  The Defendants are imposing these additional price increases even though
there continues to be substantial overcapacity in the industry. Absent the conspiracy, it would
be contrary to the interest of any Defendant to impose such large increases because of the
incentive of other manufacturers with underutilized capacity to undercut such a large price
increase. As USG again acknowledged in April:

> [T]here is significant excess wallboard production capacity industry-wide in the
> United States. Industry capacity in the United States was approximately 31.9
> billion square feet as of January 1, 2012. We estimate that the industry capacity
> utilization was approximately 54% during the first quarter of 2012 compared to
> 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011.
> We project that the industry capacity utilization rate will remain at approximately
> the current level for the balance of 2012.

104.  USG recognized that "such a low level of capacity utilization" puts "pressure on
gypsum wallboard selling prices and gross margins."

105.  The Defendants are also maintaining supply restrictions to facilitate the
coordinated imposition of another round of large price increases. For example, USG,
National Gypsum, American Gypsum, Temple-Inland, LaFarge, CertainTeed and Georgia-
Pacific have all begun communicating and imposing supply restrictions limiting the ability of

39

distributors to purchase larger amounts in late 2012. USG has indicated that on or about September 18, 2012, it "put in a controlled distribution policy for our customers" and, as a result, customers "know there's a ceiling on what they can purchase."

106. During the same time period, the other Defendants have imposed similar supply restraints. The Defendants are imposing those supply restrictions even though there is substantial unused capacity in the industry. Absent the conspiracy, it would not be in the independent interest of any Defendant to impose such a supply restraint unilaterally, because its competitors could gain a significant competitive advantage by providing the gypsum board that is being withheld.

## VIOLATIONS OF THE ANTITRUST LAWS

107. Beginning by at least September 2011 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of gypsum board in the United States.

108. Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of gypsum board sold in the United States. These activities included:

> (a)    participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of gypsum board in the United States;
>
> (b)    agreement during those meetings, conversations, and communications to charge prices at specified levels and otherwise to fix, raise, maintain, or stabilize prices of gypsum board sold in the United States;

(c)     agreement during those meetings, conversations, and communications to discontinue the industry practice of providing job quotes, in furtherance of their conspiracy to fix, raise, maintain, or stabilize the prices of gypsum board sold in the United States.

(d)     agreement during those meetings, conversations, and communications to impose supply restrictions in furtherance of their conspiracy to fix, raise, maintain, or stabilize prices of gypsum board sold in the United States; and

(e)     taking numerous steps, as set forth above, to implement and maintain the conspiracy, including monitoring compliance of fellow conspirators.

109.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

110.    Throughout the Class Period, Plaintiff and the other Class members purchased gypsum board from Defendants (or their subsidiaries or controlled affiliates) at supra- competitive prices.

111.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and applicable state laws discussed *supra*.

## ANTI-COMPETITVE EFFECTS

112.    As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for gypsum board than they would have paid absent collusion.

113.    Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

41

    (a)    price competition in the markets for gypsum board has been artificially restrained;

    (b)    prices for gypsum board sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

    (c)    purchasers of gypsum board from Defendants have been deprived of the benefit of free and open competition in the markets for gypsum board.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION ONE OF THE SHERMAN ACT**
**(On behalf of Plaintiff and the Nationwide Class for Injunctive Relief)**

114.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

115.    Beginning in at least September 2011, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

116.    Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for gypsum board in the United States.

117.    Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to eliminate job quotes in furtherance of their conspiracy to fix, raise, maintain, or stabilize the price of gypsum board.

118.    Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to impose supply restrictions in furtherance of their conspiracy to fix, raise, maintain, or stabilize prices of gypsum board sold in the United States.

119.    As a result of Defendants' unlawful conduct, Plaintiff and other members of the Classes have been injured in their property in that they have paid more for gypsum board than they otherwise would have paid absent Defendants' misconduct.

120.    The alleged contract, combination or conspiracy among competitors constitutes a *per se* violation of the federal antitrust laws.

121.    These violations are continuing and will continue unless enjoined by this Court.

122.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class are entitled to a final and permanent injunction against Defendants, preventing and restraining the violations alleged herein.

123.    Pursuant to the Clayton Act, Plaintiff and the Class are entitled to the costs of prosecuting this suit, including a reasonable attorney's fee and expert fees.

124.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## SECOND CLAIM FOR RELIEF
## VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS
### (On Behalf of State Subclasses)

125.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

126.    By reason of the foregoing, the Defendants have entered into a trust, contract, combination, understanding, and agreement in restraint of trade in violation of Arizona Revised Stat. § 44-1401 *et seq.*[4]; California Bus. & Prof. Code § 16701 *et seq.*; District of Columbia Code Ann. § 28-4501 *et seq.*; 740 Illinois Comp. Stat. § 10/1 *et seq.*; Iowa Code § 553.1 *et seq.*;

---

[4] In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1415, Plaintiff notified the Arizona Attorney General of the existence of this action.

Kansas Stat. Ann. § 50-101 *et seq.*; Maine Rev. Stat. Ann. tit. 10, § 1101 *et seq.*; Michigan Comp. Laws. Ann. § 445.771 *et seq.*; Minnesota Stat. § 325D.49 *et seq.*; Mississippi Code Ann. § 75-21-1 *et seq.*; Nebraska Rev. Stat. §§ 59-801 *et seq.* and § 59-1601 *et seq.*; Nevada Rev. Stat. Ann. § 598A *et seq.*[5]; New Hampshire Revised Stat. Ann. § 356:1 *et seq.*; New Mexico Stat. Ann. § 57-1-1 *et seq.*; New York Gen. Bus. Law § 340 *et seq.*; North Carolina Gen. Stat. § 75-1 *et seq.*; North Dakota Cent. Code § 51-08.1-01 *et seq.*; Puerto Rico Laws Ann. tit. 10, § 257 *et seq.*; South Dakota Codified Laws § 37-1-3.1 *et seq.*; Tennessee Code Ann. § 47-25-101 *et seq.*; Utah Code Ann. § 76-10-911 *et seq.*[6]; West Virginia Code § 47-18-1 *et seq.*; and Wisconsin Stat. § 133.01 *et seq.*

127.    State Subclass members in each of the states listed above paid supra-competitive, artificially inflated prices for gypsum board. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and State Subclass members have been injured in their business and property in that they paid more for gypsum board than they otherwise would have paid in the absence of the Defendants' unlawful conduct.

128.    As a result of the Defendants' violations of the statutes set forth above, Plaintiff and other State Subclass members seek damages and costs of suit, including reasonable attorneys' fees, and all other forms of relief available under the state antitrust statutes listed above.

/////

/////

/////

---

[5] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 589A.210(3), Plaintiff provided the Nevada Attorney General with a copy of this Complaint.

[6] In compliance with Utah Code Ann. § 76-10-919(9), Plaintiff notified the Utah Attorney General of the existence of this action and provided a copy of the Complaint.

### THIRD CLAIM FOR RELIEF
### VIOLATIONS OF STATE CONSUMER PROTECTION AND
### UNFAIR COMPETITION LAWS
### (On Behalf of State Subclasses)

129.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

130.    The Defendants have engaged in unfair, unconscionable, deceptive, and fraudulent acts or practices and unfair methods of competition in violation of California Bus. & Prof. Code § 17200 *et seq.*; D.C. Code § 28-3901 *et seq.*; Florida Stat. § 501.201 *et seq.*; Nebraska Revised Statutes § 59-1601 *et seq.*; Nevada Rev. Stat. § 598.0903 *et seq.*; New Hampshire Rev. Stat. Ann. § 358-A *et seq.*; New Mexico Stat. Ann. § 57-12-1 *et seq.*; North Carolina Gen. Stat. § 75-1.1 *et seq*; Rhode Island Gen. Laws § 6-13.1-1 *et seq.*; Utah Code Ann. § 13-11-1 *et seq.*; and Vermont Stat. Ann. tit. 9, § 2451 *et seq.*[7]

131.    State Subclass members in the states listed above paid supra-competitive, artificially inflated prices for gypsum board. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and the members of the State Subclasses have been injured in their business and property in that they paid more for gypsum board than they otherwise would have paid absent the Defendants' unlawful conduct.

132.    As a result of the Defendants' violations of the laws listed above, Plaintiff and members of the State Subclasses for the states listed above are entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by the Defendants as a result of such business practices, including compensable and such other damages allowed by law.

---

[7] Pursuant to Massachusetts General Laws, Chapter 93A, § 1 *et seq.*, demand letters were sent to each of the Defendants on January 29, 2013. Plaintiff anticipates amending this Complaint after the expiration of the thirty day period contemplated in that provision.

**FOURTH CLAIM FOR RELIEF**
**VIOLATIONS OF STATE UNJUST ENRICHMENT LAWS**
**(On Behalf of the State Subclasses)**

133.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

134.     By reason of their unlawful conduct, Defendants should make restitution to Plaintiff and members of the Indirect Purchaser State Subclasses listed below.

135.     Plaintiff and members of the following Indirect Purchaser State Subclasses, by overpaying for gypsum board, have conferred a benefit on Defendants. Defendants knowingly accepted and retained the overpayments such that it would be inequitable for Defendants to keep the inflated profits.

136.     The detriment suffered by Plaintiff and the members of the State Subclasses, and the Defendants' unjust enrichment, were related to and flowed from the wrongful conduct alleged herein, including, without limitation, the Defendants' unlawful and anti-competitive acts described above which fixed, raised, and/or maintained the purchase price of gypsum board at supra-competitive levels.

137.     Under common law principles of unjust enrichment, the Defendants should not be permitted to retain the benefits conferred through over-payments by Plaintiff and Class members. Plaintiff and the members of the State Subclasses accordingly are entitled to disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and members of the State Subclasses may seek restitution.

138.     Plaintiff and the following Indirect Purchaser State Subclasses base their claims for unjust enrichment and disgorgement of profits upon common law principles of unjust enrichment recognized in each of their respective states:

A.  Arizona Indirect Purchaser Class;

B.  Arkansas Indirect Purchaser Class;

C.  California Indirect Purchaser Class;

D.  District of Columbia Indirect Purchaser Class;

E.  Illinois Indirect Purchaser Class

F.  Iowa Indirect Purchaser Class;

G.  Kansas Indirect Purchaser Class;

H.  Maine Indirect Purchaser Class;

I.   Massachusetts Indirect Purchaser Class;

J.   Michigan Indirect Purchaser Class;

K.  Minnesota Indirect Purchaser Class;

L.  Mississippi Indirect Purchaser Class;

M. Missouri Indirect Purchaser Class;

N.  Nebraska Indirect Purchaser Class;

O.  Nevada Indirect Purchaser Class;

P.  New Hampshire Indirect Purchaser Class;

Q.  New Mexico Indirect Purchaser Class;

R.  New York Indirect Purchaser Class;

S.  Puerto Rico Indirect Purchaser Class;

T.  Rhode Island Indirect Purchaser Class;

U.  South Dakota Indirect Purchaser Class;

V.  Tennessee Indirect Purchaser Class;

W. Utah Indirect Purchaser Class;

X.   Vermont Indirect Purchaser Class;

Y.   West Virginia Indirect Purchaser Class; and

Z.   Wisconsin Indirect Purchaser Class.

## DEMAND FOR JURY TRIAL

139.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

## DEMAND FOR RELIEF

140.   Wherefore, Plaintiff demands judgment against Defendants as follows:

(a)   Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class and State Subclasses as defined therein;

(b)   That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and applicable state laws described herein.

(c)   That judgment be entered for Plaintiff and the Class and State Subclass members against Defendants for three times the amount of damages sustained as allowed by law.

(d)   That Plaintiff and the members of the Class and State Subclasses recover pre-judgment and post-judgment interest as permitted by law.

(e)   That Plaintiff and the members of the Class and State Subclasses recover their costs of the suit, including attorneys' fees, as provided by law.

(f)     For such other and further relief as is just and proper under the circumstances.

DATED: January 30, 2013

Kenneth I. Trujillo (ID No. 46520)
Ira N. Richards (ID No. 50879)
**TRUJILLO, RODRIGUEZ &
RICHARDS, LLC**
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
Telephone: (215) 731-9004
Facsimile: (215) 731-9044
ktrujillo@trrlaw.com
ira@trrlaw.com

Robert S. Green
James Robert Noblin
Lesley E. Weaver
**GREEN & NOBLIN, P.C.**
700 Larkspur Landing Circle, Suite 275
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710